IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Ying Yao, on behalf of herself** ) <br> **and all others similarly situated** ) <br> ) <br>     **Plaintiffs,** ) <br> ) <br>   v. ) <br> ) <br> **Carillon Tower/Chicago LP;** ) <br> **Forefront EB-5 Fund (ICT) LLC;** ) <br> **Tizi LLC d/b/a Local Government** ) <br>   **Regional Center of Illinois;** ) <br> **TD Bank N.A.;** ) <br> **Symmetry Property Development II LLC;** ) <br> **Fordham Real Estate LLC;** ) <br> **And Jeffrey L. Laytin** ) <br>     **Defendants.** ) | **No.: 1: 18-cv-07865** <br><br> **Judge: Hon. Kocoras** <br><br> **Magistrate: Hon. Kim** |

**MOTION FOR PRELIMINARY INJUNCTION COMPELLING DEFENDANT
LAYTIN TO DISCLOSE THE LOCATION AND FREEZE THE $49.5
MILLION ASSETS IN CONTROVERSY**

  Plaintiffs move this Honorable Court for injunctive relief under F.R.C.P. 65 compelling Defendant Jeffrey L. Laytin and the three Defendants that he controls (collectively, "Laytin") to disclose the whereabouts and status of the $49.5 million in controversy, and to freeze such assets (or an equivalent of such assets) until this case is resolved or settled. In support of this Motion, the Plaintiffs state as follows:

**I.  $49,500,000 of Chinese Investors' Money is Missing**

  Plaintiffs are a class of 90 Chinese investors who each put $550,000 in escrow with Defendant TD Bank N.A. ("TD Bank") in 2015, for a total of $49,500,000 in cash. The money was intended for a subsequently aborted project called "Carillon

Tower," a proposed 42-storey mixed-use structure on the vacant lot at Superior and Wabash Streets in the Magnificent Mile area in the 42nd Ward of Chicago. This was an "EB-5" transaction under which the Chinese investors sought to qualify for a conditional green card that requires each investor to prove that his investment generated ten (10) jobs in America.

The offering documents signed by the Plaintiffs provided them with complete protection in the form of a refund if the project did not go forward. This was accomplished by a promise from escrow agent TD Bank that it would only release the $49.5 million if a "Holdback Trigger" was satisfied – and this Holdback Trigger required that a plan for the project had been submitted to the Chicago Commissioner of Planning and Development (See Complaint at ¶24). The offering documents said that if the Holdback Trigger was not satisfied, the money would be refunded to the Chinese investors.

The Holdback Trigger was never satisfied.

42nd Ward Alderman Brendan Reilly nixed the project, and the plan was never submitted to the Chicago Commissioner of Planning and Development (See Complaint at ¶14 et seq.). Chicago tradition (referred to as 'Aldermanic prerogative') dictates that a construction plan cannot be submitted to the Commissioner of Planning and Development unless and until the Alderman approves it. In this case, there was a vocal neighborhood outcry against the project, and it was rejected by the Alderman and never got off the ground.

Because the condition for release of funds from escrow was never satisfied, the money should have been refunded to the Chinese back in 2015. Instead, TD Bank wrongfully released the funds to the Laytin parties in 2015.

Plaintiffs have lost control of their own money for three years already, and it now seems laughable that the Confidential Private Offering Memorandum under which they invested (i.e., the prospectus) says that the project would be *finished* in 2017: "The construction period is expected to take 24 months and is projected to be completed in October 2017, assuming construction commences in October 2015." (See Complaint, Ex. 1, at 5).

No shovel has been put into the ground. No plan has been submitted. There is no reason to believe that this project will ever move forward. In fact, Alderman Reilly recently moved to downzone the subject property to prevent anything resembling this project from being built there, as reported in *Crain's Chicago Business* and *The Real Deal*:

> **Reilly looks to thwart Symmetry Property Development's River North plans again**
>
> Alderman Brendan Reilly (42nd) moved to downzone some River North properties where Symmetry Property Development wants to tear down several buildings. Reilly's move would hamstring New York-based Symmetry's ability to develop the properties, something he's already done once. He rejected the developer's plan for a 60-unit condominium hotel on the site last year, saying it would add to traffic woes in the area. (citing to *Crain's Chicago Business*).

3

See John O'Brien, "Alderman Reilly looks to disrupt Symmetry Property project," *The Real Deal Chicago*, November 1, 2018, https://therealdeal.com/chicago/2018/11/01/chicago-cheat-sheet-four-seasons-condo-sells-the-78-seeks-first-approvals-more/ (last visited January 31, 2019).

Plaintiffs' money – in many cases their family's life savings - has passed through the hands of TD Bank to the Laytin-controlled parties. It is long past due for those Defendants to account for the money's location and to prove that it still exists as a source of recovery for the Plaintiffs. If the money is missing, in whole or part, this case becomes a criminal matter, and the Plaintiffs need to bring in the DOJ and the SEC. Plaintiff's counsel has undertaken a diligent search for the money but cannot locate the $49.5 million that is the subject of this lawsuit. See Affidavit of Plaintiff's Counsel attached hereto.

**II.     The Funds may be dissipated and Laytin may be Insolvent**

If this was a normal situation, Plaintiffs would await discovery to learn the location of the $49.5 million, and they would not seek injunctive relief because money damages would render them whole at the conclusion of this lawsuit.

But there are two key exceptions recognized in this District where injunctive relief is warranted even though the plaintiff seeks money damages: (i) when the defendant is likely to dissipate the assets or become insolvent and judgment proof, and  (ii) when the Plaintiff has a claim to *specific assets* - even if cash - that need to be preserved for potential recovery. *Monfardini v. Quinlan*, 2003 U.S. Dist. LEXIS 10064 *8, 11 (N.D. Ill. 2003)(Judge Magistrate Ashman). The Court in *Monfardini*

4

ordered a freeze of fungible cash that was subject to a pledge agreement on the grounds that the cash was the specific asset in controversy, and a freeze was necessary to prevent dissipation or conversion into a different type of asset. The *Monfardini* decision is unreported but it offers a succinct review of the law based on reported decisions:

> One exception to the general rule that the availability of money damages at the conclusion of the trial will make the plaintiff whole is the insolvency exception. A defendant's potential or actual insolvency is a "standard ground" for demonstrating that an award of damages is inadequate. *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 596 (7th Cir. 1985) (noting that a loss may be irreparable if the defendant's insolvency is apparent but the defendant is not yet in bankruptcy) . . . Another exception is "when the claimant has an interest in *specific funds* held by the debtor." *Franz v. Calaco Dev. Corp.*, 322 Ill. App. 3d 941, 751 N.E.2d 1250, 1256, 256 Ill. Dec. 413 (Ill. App. Ct. 2001) (emphasis added); *Newby*, 188 F. Supp. 2d at 696. The funds sought to be frozen must have a specific relationship to the case and must be the funds in controversy between the parties. *Kurti v. Silk Plants Etc. Franchise Sys.*, 200 Ill. App. 3d 605, 558 N.E.2d 361, 364, 146 Ill. Dec. 398 (Ill. App. Ct. 1990).

*Monfardini*, at *8, 11. Both exceptions apply here.

First of all, no one will tell Plaintiffs where their $49.5 million is located. Defendant TD Bank who released the money doesn't know where the money is. None of the other Defendants know where the money is. All they can do is throw up their hands and suggest that Plaintiffs speak with Defendant Laytin and his entities, but Plaintiffs have spoken to them consistently for months and they aren't saying where the money is located or that it is safe. The Plaintiffs are entitled to assurance that their money is safe and will be held inviolate while this case is

pending. It is disturbing and highly suspicious that no one will say where the money in controversy is located, or even that it still exists.

Plaintiffs also have an equitable claim (as opposed to a claim for money damages) that since they are limited partners in Defendant Carillon Towers/Chicago LP, they are owed a duty of good faith and fair dealing by the general partner, which is a Laytin-controlled entity. Plaintiffs have an equitable claim for assurance from Laytin that their money is safe and has not been spent on some other project or otherwise dissipated.

Plaintiffs have legitimate cause for concern because Laytin and his entities will not divulge the location or current value of the money, nor do the Laytin entities appear to have any other assets from which Plaintiffs could recover, to wit:

> 1. Defendant Symmetry, the ostensible developer, has a website (sympd.com) that is a placeholder and does not show any ongoing projects. Symmetry's physical address is the same as that for Laytin's law office, so it is not clear if Symmetry is simply an alter ego of Laytin. A thorough search has not been able to turn up any other Symmetry projects or assets. This raises a serious risk of commingling of funds between Laytin and the entities that he controls.
>
> 2. The SEC's filing system (EDGAR) shows defendant Symmetry and its affiliates as having filed Form Ds (for private placements) only in 2012 and nothing

subsequently, which suggests that they have not done other projects since then. Symmetry's filing with the New York Secretary of State leads back to the Law Office of Jeffrey L. Laytin, again raising the concern that Symmetry is an alter ego of Laytin and that the funds have been commingled.

3. Symmetry's SEC filing from 2012 lists Bradley Riefler as a Director and "Related Party," but Mr. Riefler's creditors pushed him into bankruptcy liquidation and the Bankruptcy Trustee has charged him with making false oaths about his finances and failure to disclose businesses and debts. See https://westfaironline.com/108856/court-denies-wealth-manager-bradley-reiflers-bid-to-dismiss-50m-in-debts/ (last visited January 31, 2019). In 2018, he was barred from associating with any FINRA regulated entity. Disciplinary Proceeding 2016050924601 (August 7, 2018). The *Wall Street Journal* said that he was facing jail time for contempt of court and that he owed millions to J.P. Morgan. His current whereabouts are unknown to Plaintiffs. These are not comforting facts for Plaintiffs whose money is supposed to be held safely with such persons.

7

4. The Defendant Tizi LLC has informed Plaintiff's counsel that they merely 'rented' out their EB-5 Regional Center status to Laytin so he could build in Chicago, and they have no idea what Laytin did with the money, nor whether he is working with any other regional centers on other projects that would generate income.

5. Mr. Laytin's law firm website (jlaytinlaw.com) has a 2013 copyright and does not mention any recent projects. It is not clear if he is still practicing law, doing real estate deals, or generating any income.

6. Plaintiffs' counsel has been in touch with Alderman Reilly's office since this case began, and they are strongly opposed to this project and will fight it, meaning that it can only go forward in the most unlikely circumstances in Chicago history, namely that a project goes forward over the objection of an Alderman and his constituents. The project is wildly unpopular and has generated community outcry. The chance of it being built are infinitesimally low, and the Chinese Plaintiffs have already lost three years and have no trust in Laytin.

7. It has taken six weeks of negotiation for Laytin to offer a refund only to the lead plaintiff in this matter,

leaving 89 others with nothing. This suggests that he does not have the money to pay back the Plaintiffs.

8. The Plaintiffs have waited 3 years to find out from the general partner (Laytin) where their money is located. That alone is enough to raise suspicions.

### III. Plaintiffs Can Meet the Standard of a TRO

To obtain preliminary injunctive relief under Rule 65, Plaintiffs must show (i) reasonable likelihood of success on the merits; (ii) no adequate remedy exists at law; (iii) irreparable harm if the injunctive relief is not granted; (iv) the balance of equities favors Plaintiff in that the burden of the defendants is minor compared to the loss facing the plaintiffs; and (v) injunctive relief will not harm the public interest. *St. John's United Church of Christ v City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007); *Joelner v. Village of Washington Park*, 378 F.3d 613, 619 (7th Cir. 2004)("In order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest.")

These elements are easily satisfied.

First, Plaintiffs are likely to win on the merits. The movement of their money from TD Bank to Laytin was subject to the Holdback Trigger that never took place, so Laytin should not have received the money in the first place, but having

9

received it, he had a duty to safeguard and account for it. Under the terms of the investment documents, the money must eventually come back to the Plaintiffs because the Holdback Trigger was not satisfied.

The Plaintiffs obviously have a claim against TD Bank for wrongfully releasing the $49.5 million to Laytin, but TD Bank has indicated that they may invoke indemnity from Laytin, which brings this Court back to the question of whether Laytin has retained and safeguarded the investment funds.

Second, there is no adequate remedy at law unless Laytin has the money and is safeguarding it for the Plaintiffs, or that he has other assets from which Plaintiffs may recover. As noted above, courts in this District have held that an injunction can apply when specific assets – even cash – are in controversy and need to be safeguarded for a proper remedy.

Furthermore, Plaintiffs are seeking equitable relief in that they are merely forcing Laytin to do what he should already be doing as a matter of partnership law – making a report to limited partners of where their money is located and that it is safeguarded.

Third, irreparable harm is satisfied when there is a danger that the defendant is insolvent. *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 290 (1940)("there were allegations that [the defendant] was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against [the defendant], without recourse to the fund in the hands of [a third party], would be inadequate"). A defendant's potential or actual insolvency is sufficient to demonstrate that an award of damages at the conclusion of trial is inadequate. *Am.*

*Hosp. Supply Corp. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 596 (7th Cir. 1985). Here, there is no public information to indicate Laytin or his entities solvency, and in fact there is only negative news about Defendant Symmetry which he controls.

Fourth, in weighing the burdens, it is obvious that the burden on Laytin is miniscule: all he has to do is provide a one-page bank receipt showing where the money is located and then make a promise not to dissipate the money during this lawsuit unless approved by the Court. That is something he is supposed to be doing anyway since there is no way for him to spend money on a project that is dead in the water. It would be inequitable to force Plaintiffs and their counsel to incur massive costs of litigation only to face the possibility of reaching the endpoint and getting a judgment only to find that Laytin dissipated or lost the money and is judgment-proof.

Finally, there is no harm to the public since the citizens of Chicago didn't want Carillon Tower to be built in the first place, and there is a public interest in due enforcement of the securities laws and the laws governing the duties of a general partner to limited partners.

As a general matter of law, District Courts have "broad equitable powers to grant ancillary relief [to freeze assets] . . . where necessary and proper to effectuate the purposes of the securities laws." *SEC v. Prater*, 289 F. Supp. 2d 39 (D. Conn. 2003)(freezing assets), quoting *SEC v. Amer. Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2nd Cir. 1987)(noting that the District Court can impound assets, freeze assets, and prevent movement of assets). The decision in *Prater* says that in a motion for injunctive relief freezing assets in a securities lawsuit, a reviewing court must

weigh the benefits to the plaintiffs against the burdens to the defendant, because there are some cases where, for example, an asset freeze would put a defendant out of business. But Plaintiffs do not propose to freeze *all* of Laytin's assets, nor do they propose to interfere with his other business ventures, if he has any. They only want to ensure that *their* money – which cannot be used for any other legitimate purpose – is safeguarded. The harm to Laytin is so small that the bond required under F.R.C.P. 65 should only be $1000, if anything at all.

The burden on Laytin is less than half an hour to print out a bank statement showing $49.5 million of the Plaintiff's money (presumably with interest) and to submit a written promise not to move the funds until this case is resolved. That is a tiny burden. But his failure or inability to do this will thrust 90 investors into turmoil and will portend financial ruin for many of them. The balance of equities favors a preliminary injunction.

WHEREFORE, Plaintiffs seek an Order under F.R.C.P. 65 granting preliminary injunctive relief in conformity with Rule 65(c) and (d) and a finding by this Court as follows:

1. A preliminary injunction is necessary to identify and safeguard the specific assets that are the subject of this litigation;

2. The preliminary injunction compels defendant Laytin to disclose the location and current value of the $49.5 million invested by the Plaintiffs;

3) The injunction shall last for the duration of this litigation; and

4) Because the burden on Laytin is miniscule, Plaintiffs shall post bond in the amount of $1,000, or, in the Court's discretion, no bond.

Dated:  February 2, 2019

> Respectfully Submitted,
>
> */s/ Douglas Litowitz*
>
> Attorney for Plaintiffs

Douglas Eliot Litowitz
413 Locust Place
Deerfield, IL 60015
(312) 622-2848

## Certificate of Service

I certify that on the 2nd day of February, 2019, I electronically filed this Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system.

> */s/ Doug Litowitz*