IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Lina Dou, Tingyang Shao, Yixuan Tao, Xiuqin Xing, Emmy Go, Yanming Wang, Shiyang Xiao, Lihong Zhan, Geli Shi, and Ying Yao, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No.: 1:18-cv-07865 |
| v. | ) ) | |
| Carillon Tower/Chicago LP; Forefront EB-5 Fund (ICT) LLC; Tizi LLC d/b/a Local Government Regional Center of Illinois; TD Bank N.A.; Symmetry Property Development II LLC; Fordham Real Estate LLC; and Jeffrey L. Laytin, Defendants. | ) ) ) ) ) ) ) ) ) ) | **Hon. Charles P. Kocoras** Presiding Hon. Young B. Kim Magistrate |

## FIRST AMENDED CLASS ACTION COMPLAINT

### Nature of the Case

This lawsuit is fallout from a failed project called "Carillon Tower," a planned 42-story tower at Superior and Wabash Streets in the Magnificent Mile, supposedly housing a 200-unit Hilton hotel, 154 apartment units, a 225-seat Gibson's Restaurant, and parking spaces for 154 vehicles. It was marketed to Chinese investors as an "EB-5" path to a green card, scheduled to begin construction in 2015 and be completed in 2017.

In reality, nothing was ever built and no shovel was ever put into the ground. The entire plan was rejected by 42nd Ward Alderman Brendan Reilly after a vocal neighborhood outcry, and plans for the project were not formally submitted to the Commissioner of Planning and Development; at most, some discussions and meetings were had which do NOT amount to a formal submission. The lack of a formal submission is clear from the fact that after 4 years there has not been any explicit approval: the Defendants are still 'at the drawing board.' As recently as March 7, 2019, Defendants were denied a permit to demolish buildings on the site which were granted preliminary landmark status, proving that this project has gone nowhere in four years, yet all the money invested is gone.

The Chinese investors who are Plaintiffs in this case placed $49.5 million ($550,000 each) into an escrow with Defendant TD Bank NA ("TD") to be released only on condition that the project was submitted for approval by the Commissioner of Planning and Development, and if this didn't happen, the money was to be refunded. The most that Defendants did was meet with the Office of Planning, but no final plan was submitted for approval or denial. Despite this condition not being satisfied, TD released the money from escrow in 2015 to entities owned or controlled by Defendant Laytin. The Plaintiff's money – in many cases their family's life savings -- has been missing for over three years while they were fed misinformation about the project to keep them from suing.

Lead Plaintiff Lina Dou ("Dou") is one of ninety Chinese investors in this ill-fated project. Along with the other class members, they seek a return of their $49.5

2

million dollars from TD, the Laytin affiliates who were wrongfully given the money, and from the other Defendants who structured this transaction and partnered with these Defendants,

The Chinese investors simply want their money returned with whatever interest, penalties, and fees they are entitled. They are indifferent to which particular defendant was most at fault, e.g., whether the fault lies mostly with TD for breaking the escrow, or with the developers for wrongfully instructing TD to release the escrow, or with the EB-5 regional center Tizi LLC for overseeing the transaction, or with the other developer Defendants for facilitating this massive wrongdoing. The only sure thing is that this money was wrongfully taken from them to fund a non-existent project, and now the money must be returned.

## The Parties

1.      Plaintiff Lina Dou is a Chinese national residing in China.

2.      All members of the putative Class of ninety investors are Chinese citizens. None of the putative class members are residents of the State of Illinois.

3.      Defendant Carillon Tower/Chicago LP is a New York limited partnership (the "LP").

4.      Defendant Forefront EB-5 Fund (ICT) LLC is a New York limited liability company acting as the general partner of the LP (the "GP").

5.      Defendant Tizi LLC is an Illinois limited liability company doing business under the assumed name of Local Government Regional Center of Illinois

3

(the "Tizi"), a regional center authorized to help developers raise money from foreigners under the EB-5 program.

6. Defendant TD Bank N.A. is a national banking association with a principal place of business in Cherry Hill, New Jersey, and the escrow agent who, under the terms of the Offering, was required to hold the investors' money until certain conditions were satisfied ("TD").

7. Defendant Symmetry Property Development II LLC is a New York limited liability company that, under the terms of the Offering, was to be the co-developer of the Project ("Symmetry").

8. Defendant Fordham Real Estate LLC is an Illinois limited liability company that, under the terms of the Offering, was to be the co-developer (with Symmetry) to develop the Project ("Fordham").

9. Defendant Jeffrey L. Laytin is the managing member of the GP and thereby had control of the GP. He is also listed in SEC filings as the manager of Symmetry, the co-developer of the Project.

## Jurisdiction and Venue

10. Jurisdiction is proper in federal court pursuant to 28 U.S.C. 1332(a)(2) because this is a civil matter, in excess of the statutory minimum, between subjects of a foreign state (The People's Republic of China) and citizens and entities of the United States.

11.     Jurisdiction is also proper in federal court pursuant to 28 U.S.C. 1331 because this action involves questions of federal law, namely whether the Defendants violated the Securities Exchange Act of 1934, 15 U.S.C. 77q(a) et seq.

12.     Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) and (2) because two of the essential Defendants (Tizi and Fordham) are Illinois companies, and the subject property is located in downtown Chicago, in this district.

13.     The Defendants have all purposely availed themselves of this district by setting up a development Project in this district.

<u>Factual Allegations Common to All Counts</u>

14.     Plaintiff Dou and other class members were solicited and marketed by Tizi and its overseas agents in China to invest in an EB-5 project that would offer the promise of an eventual green card by investment in a project that generated 10 jobs per investor.

15.     Plaintiff Dou and others were provided with brochures marked "Forefront Capital" and "Forefront EB-5 Fund" which described an EB-5 investment into a building that would supposedly be built in downtown Chicago.

16.     Plaintiff Dou and others invested pursuant to a document styled "Confidential Private Offering Memorandum dated January 15, 2015" (the "PPM"), attached as Exhibit 1.

17.     The vast majority of Plaintiffs cannot speak or read English, and those that can cannot read or write beyond the elementary school level. As part of the Offering, a copy and the PPM, translated into their native language (Mandarin

Chinese), was never provided to any plaintiff or any putative class member before they were asked to sign the execution pages of the PPM.

18.     Although the PPM stipulates that English controls and that investors are responsible for hiring a translator, the cost of translating a document of this size and complexity is prohibitive and the investor relies mainly on the fiduciary obligation of the mangers to ensure that they will be treated fairly.

19.     The PPM is an aggregate document in pdf format that contains a number of interconnected documents: a subscription agreement in favor of the GP with instructions for the Plaintiffs to wire the $550,000 into an escrow at TD ("Subscription Agreement"); a limited partnership agreement whereby each Plaintiff agrees to be a limited partner in the LP ("LP Agreement"); and an Escrow Agreement between the LP and TD ("Escrow Agreement"). Copies of such documents are contained within Exhibit 1 and referred to herein as the "Investment Documents."

20.     Payments by the Plaintiffs of $550,000 were acknowledged in confirmations letters sent by TD to Defendant Laytin as manager of the GP and the LP, a sample of which is attached as Exhibit 2.  Upon information and belief, a similar letter was used to acknowledge the same investment by each putative class member.

21.     Page 3 of the PPM provides that Symmetry and Fordham will work together in the "acquisition, construction, and development of the real property located at the corner of Superior Street and Wabash Avenue, in Chicago, Cook

6

County, Illinois to be known as the Carillon Tower, a 42 story tower housing a 200-room hotel operating under the Canopy by Hilton brand, 154 luxury apartment units, a 225 seat restaurant operated by Gibson's Restaurant Group, and parking space for 154 vehicles (collectively, the "Project").

22.    The "Project" was meant to be over 40 stories, over 700 feet tall, with a Hilton Hotel, apartment units, a Gibson's Restaurant, and parking.  That is what the investors were sold.

23.    The PPM at page 8 provides that each investor agrees to place $550,000 of their own funds into an escrow account with TD.  TD was then to release $50,000 of each investor's escrow funds to the LP immediately as an "Administrative Fee" for putting the deal together, and would hold the remaining $500,000 as a "Capital Contribution" until a "Holdback Trigger" had been satisfied.

24.    The Holdback Trigger is defined as follows on page 8 of the PPM and similarly throughout the Investment Documents:

"* USCIS has approved the Form I-526 Petition of one Subscriber for a Unit in the Offering; and

* The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."

25.    The second condition of the Holdback Trigger is that the LP must provide evidence of **formally** submitting the **Project** plan to the **Chicago Commissioner**.  This condition has never been met and in all likelihood can never be

met as the Alderman has moved to downzone the subject property, and upon information and belief based on conversations with his staff, he has no intention of approving the Project.

26. Furthermore, the plans called for the demolition and usage of space currently occupied by three buildings under temporary landmark status, and a permit to demolish these buildings has recently been denied to Defendant Symmetry – so there is no way to build this Project anyway.

27. Exhibit B to the Subscription Agreement is styled "Summary of Escrow Procedures" and it provides at Section G (pg. 161) that the Holdback Trigger requires that "the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."

28. The Escrow Agreement attached to the PPM (page 165) is a word-for-word exact copy of the document signed by TD Bank NA on May 19, 2015, and provides that TD will release the funds from escrow only upon notification from the LP that the Holdback Trigger has been satisfied.

29. Further, the Escrow Agreement provides that if the Offering is cancelled, the Administrative Fee of $50,000 must be returned to investors, for a total refund to investors of $550,000.

30. The trigger for the entire Project – the entire basis on which the Defendants took $550,000 from the Plaintiffs -- was that a formal plan was going to be submitted to the Commissioner of Planning and Development, which never happened. It is not clear on which date the various Defendants realized that this

condition had not been satisfied, but they all acted "as if" it had been satisfied and acquiesced, stood by, and did nothing while the Plaintiff's money was wrongfully released.

31.     On information and belief, an employee and/or agent of TD was informed that the Holdback Trigger for the Project had been satisfied.

32.     On information and belief, an employee and/or agent of the LP was informed that the Holdback Trigger for the Project had been satisfied.

33.     Upon information and belief, an employee and/or agent of the GP was informed that the Holdback Trigger for the Project had been satisfied.

34.     Upon information and belief, an employee and/or agent of Tizi was informed that the Holdback Trigger for the Project had been satisfied.

35.     Upon information and belief, an employee and/or agent of Symmetry was informed that the Holdback Trigger for the Project had been satisfied.

36.     Upon information and belief, an employee and/or agent of Fordham was informed that the Holdback Trigger for the Project had been satisfied.

37.     Upon information and belief, TD has released to the LP the $50,000 Administrative Fee from each investor (totaling $4.5 million) even though there is nothing to "administer" because there is no Project, and even though the Escrow Agreement provides that if the Holdback Trigger is not satisfied, the $50,000 must be returned to each investor.

38. On information and belief, TD has released some and/or all of the $500,000 capital funds invested by the Plaintiff and each putative class member to the LP.

39. Upon information and belief, the GP has transferred some and/or all of the $500,000 capital funds invested by the Plaintiff and each of the putative class members from the LP fund to defendants Symmetry and/or Fordham.

40. The Offering documents create a loop of self-dealing: Defendant Laytin, as manager of the GP, can cause the LP to notify TD that the Holdback Trigger has been met, thereby causing the release of the Capital Contributions money to Symmetry, which is also managed by Laytin.

41. The Project plan was not submitted to the City Commissioner.

42. By longstanding Chicago tradition, a prerequisite for submitting a Plan to the City Commissioner is that the local Alderman (in this case, the 42nd Ward Alderman Brendan Reilly) first has to provide support and approval of the Project plan on behalf of his constituency.

43. Alderman Brendan Reilly rejected the Project plan and did not provide the necessary approval for the Holdback Trigger, based in part on strong community objections to the Project related to, amongst other things, exacerbation of traffic congestion and disruption of the pickup/drop-off for a nearby school.

44. On information and belief, Alderman Reilly has never approved the Carillon Tower Project, or any similar structure formal submission of a plan, relating to the Project as required to satisfy the Holdback Trigger.

45.     There is an alternative procedure known as building without Aldermanic approval, called construction "as of right" – but there is no indication that the Defendants have pursued this strategy legally or moved it one inch forward in four years.

46.     This investment was made by Plaintiff and each of the putative class members in 2015.  The PPM says at page 5 that "The construction period is expected to take 24 months and is projected to be completed in October 2017, assuming construction commences in October 2015."

47.     The condition precedent for the release of capital contribution funds held in escrow by TD to the Project GP never happened.

48.     "The Project" as defined under the PPM does not exist and will never exist in the form described in the PPM.

49.     The refund provisions of the Investment Documents were triggered as early as 2015 and the investment funds must be returned in full to the Plaintiff and putative class members with interest, fees, and costs.

50.     The PPM at page 24 (page 32 of the pdf) states that the LP is supposed to make a loan to Symmetry to fund the Project after the Holdback Trigger is met: "The first advance of the Project Loan will fund *after the Holdback Trigger is met.*" (emphasis added).

51.     Pursuant to the terms of the PPM, if the Holdback Trigger was never satisfied, TD would not have the authority to release investor funds to the LP or GP.

52.     Pursuant to the terms of the PPM, if the Holdback Trigger is not satisfied, the GP has no authority to fund any loan or otherwise transfer investor funds out of the LP fund.

53.     Members of the Plaintiff class have attempted to obtain their $550,000 investment funds from the defendants amicably, to no avail.

54.     Each putative class member investor has lost $550,000, plus accrued interest, costs, and counsel fees, as a result of the wrongful release and disbursement of the TD escrow account funds by Defendants and each of them.

## Class Action Allegations

55.     Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

56.     This action is maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

57.     **Class Definition.**  The class definition shall be:

> All foreign investors who paid $550,000 into the EB-5 fund relating to Carillon Tower/Chicago LP and whose money was placed in the escrow account for that Project and who have not received a full refund of their $550,000 investment.

58.     All members of the Class were and are similarly affected and deceived by the failure of the unlicensed brokers to register.

59.     **Numerosity.** Plaintiff's counsel believes that the number of Plaintiffs is 89, who are residents of China, making joinder impracticable.  The LP and its GP have records of such persons (their contact, banking and immigration application information), such records will allow the putative class members be notified on the

pendency of this action by Court-approved dissemination methods such as US Mail, electronic mail, Internet postings, and publication and, if the plaintiffs are the prevailing parties in this action, will also facilitate the transfer of the settlement and/or judgment proceeds to the Plaintiff and putative class members.

60. **Common Questions of Law and Fact Predominate.** Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class. These common questions of law and fact include:

> i)      Whether Plaintiffs are entitled to a return of their money under the PPM and the Investment Documents; and
>
> ii)     Whether Defendant's have violated any federal or state securities laws by failing to comply with the provisions of the Investment Documents; and
>
> iii)    Whether (and to what extent) the Defendants have committed federal or state law offenses relating to transfers of money; and
>
> iv)     Whether one or more Defendants has breached one or more of the Investment Documents; and

      v)     Whether any of the Defendants and/or other individuals aided and abetted the commission of a fraud or the conversion of the investment funds; and

      vi)    Whether any of the Defendants (or others) owed a fiduciary duty to the plaintiffs and class members; and

      vii)   Whether any of the Defendants (or others) breached their fiduciary duty to plaintiffs and the class members by way of material omissions and/or misrepresentations associated with the Offering and/or the release of the Holdback Trigger.

61. **Typicality.** The facts surrounding the investment by Plaintiff are typical of what happened with the other investors/putative class members, as they arose from the same offering and course of conduct by the Defendants.

62. The Defendants operated under a scheme and practice to wrongfully and/or fraudulently deprive the Plaintiff and the putative class of their investment monies.

63. **Adequacy.** The Plaintiff has no conflict of interest or unusual fact pattern that would render her an inadequate class representative. Plaintiff's counsel has conducted numerous class actions in this district and other federal courts.

64.     **Predominance and Superiority of Class Action.**  Given the commonality of the issues affecting each investor, which easily predominate over any minor differences, the class action is a superior method of deciding this matter versus case-by-case adjudication.  As the recovery requested by each investor is small, and is mostly a return of their own money, judicial efficiency favors the class action as a method.

**COUNT I**
**(against Tizi, Laytin, GP, LP, and Symmetry)**
**15 U.S.C. 78j (17 CFR. 240.10b-5) and 78t**
**Federal Securities Exchange Act Violation**

65.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

66.     Section 10b of the Exchange Act (15 U.S.C. 78j) provides that it shall be unlawful for any person, directly or indirectly, to use any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe for the protection of investors.

67.     In furtherance of Rule 10(b), the Commission enacted Rule 10b-5 (17 CFR 240.10b-5) which makes clear that it is unlawful to (a) employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of material fact, or (c) to engage in any act, practice or course of business which operates as a fraud or deceit on any person, in connection with the purchase and sale of a security.

68.     A "material fact" under Rule 10b-5 is any fact that a reasonable investor would find important in making a decision whether to invest.

69. Tizi – as the regional center structuring the deal - and the LP (through the GP) caused the PPM and Investor Documents to be drafted and disseminated to the Plaintiffs, and caused the Escrow Agreement to be entered into between the LP and TD, meaning that the release of money from escrow consummated a sale of securities.

70. The Investment Documents worked a fraud and deceit on the Plaintiffs because it violated the Investment Documents since their money was moved out of escrow despite the Investment Documents stating that if the Holdback Trigger is not satisfied, the money will come back in full to the investors.

71. Therefore, the Investment documents contained a misrepresentation that the money would not be moved out of escrow until the Holdback Trigger was exercised, and this misrepresentation worked a fraud on the Plaintiffs.

72. This is a material misrepresentation in the Investment Documents.

73. The Plaintiffs relied upon the Investment Documents in making their investment.

74. The promises made in the Investment Documents were untrue and made with intent to induce reliance by the Plaintiffs, causing specific and quantifiable harm to the Plaintiffs, and the Defendants are jointly and severally liable for damages caused.

75. The LP and its GP had a duty to inform the Plaintiffs that the Holdback Trigger had not been met and that the schedule set forth in the PPM had

16

become stale and misleading. Their failure to make this disclosure is an omission to state a material fact in connection with a security.

76. The Defendants acted with scienter, in full knowledge of the fact that no formal Project plan had been submitted as required.

77. The Defendants had a duty to prominently disclose potentially outcome determinative risks and material facts to the success or failure of the Project.

78. Defendants omitted to state a material fact, amounting to misrepresentation, in failing to disclose the fact that, based on long standing policy and procedure for all development in the City of Chicago, and the Defendants knowledge of such policy and procedure, the Project required Alderman/Ward approval prior to the submission of a Project plan to the City Commissioner of Development and Planning, and that the submission of any Project plan to the City Commissioner without such Alderman/Ward approval would result in rejection by the Commissioner and failure of the Project.

79. The loss causation here is easily quantifiable: each investor has lost $550,000 plus interest, and has incurred translation fees, costs, and attorney fees to obtain recovery. The discovery of this violation of the Securities Exchange Act was not made until Plaintiffs retained counsel to determine the status of their investment, in Fall of 2018.

80. Defendant Tizi has derivative liability because they acted at all times as a control person within the meaning of Section 20(a) and (b) of the 1934 Securities Exchange Act, since it was under their authority that the PPM was

issued and they had a duty to inform investors of the truth about the Project not being approved and being a failure.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.

## COUNT II
### (against Laytin, GP, LP, and Symmetry)
### 815 ILCS 5/8 et seq.
### Illinois Securities Act Violation

78.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

79.     Section 2.4 of the Illinois Securities Act defines "Controlling Person" as follows: "In case of unincorporated issuers, "controlling person" means any person offering or selling a security, or group of persons acting in concert in the offer or sale of a security, who directly or indirectly controls the activities of the issuer.

80.     Under this definition, all of the Defendants listed in this Count are Controlling Persons of the LP which issued the securities.

81.     Sections 12F and 12G of the Illinois Securities Act track the Federal Rule 10b-5 and creates liability for any persons who make any misstatements of material fact or omissions of material fact.  815 ILCS 5/12.

82. Section 13 of the Illinois Securities Act requires payment by Controlling Persons of the amount lost plus 10% per annum in interest for violation of the anti-fraud provision.

83. The securities in this case are the LP interests offered in collaboration by the Defendants, the investment by the Plaintiff constitutes a sale of securities by the Defendants, occasioned by reliance on the misrepresentations and omissions of material fact by the Defendants.

84. The securities were issued pursuant to arrangements by Tizi, an Illinois company, with respect to a project in Illinois, to be built by a co-developer in Illinois. There is a strong nexus with Illinois.

85. If the Illinois Securities Act does not apply because the GP and LP are based in New York, then the applicable law will be the New York Martin Act.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of 10% annual interest, costs and attorney fees.

## Count III
### (against Laytin, GP and LP)
### Breach of Contract of LP Agreement

86. Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

87. The LP Agreement defines "Project" as Carillon Tower, which never came to exist.

88.     Appendix 1 of the LP Agreement stipulates that the LP shall request funds to be released by TD as escrow agent only if the Holdback Trigger has been satisfied.

89.     The Holdback Trigger was not satisfied.

90.     TD was holding onto $49.5 million of investor funds ($550,000 times 90 investors) as evidenced by the acknowledgement as Exhibit 2, given for each investor.

91.     The LP, acting through the GP and Laytin, breached the LP Agreement by wrongfully – with scienter and full knowledge of falsity – informing TD that the Holdback Trigger had been satisfied.

92.     This wrongful action by the LP, in violation of the LP Agreement and the Investment Documents, caused quantifiable detriment to the Plaintiffs by having their funds dispersed to an idle Project.

93.     As a result of this breach, Plaintiffs' funds were unlawfully converted by the GP and LP.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count IV
### (against TD)
### Breach of Contract of Escrow Agreement

94.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

95.     The LP was party to that certain Escrow Agreement with TD included

20

in the Investment Documents, a word for word copy of which was signed by TD on May 19, 2015.

96.     The purpose of the Escrow Agreement was specifically to hold the funds of the Plaintiffs, making them a third-party beneficiary of the Escrow Agreement.

97.     The Escrow Agreement – though nominally between TD and the LP – was only possible because the Plaintiffs (as limited partners of the LP) put their money into escrow with TD in the first place.

98.     The Escrow Agreement has a section called "Action Upon Achievement of Holdback Trigger" which stipulates that TD will release the investor Capital Contributions (aggregate of $45 million) only upon notification from the LP that the Holdback Trigger has been satisfied.

99.     Further, the Escrow Agreement has a section called "Action Upon Termination or Cancellation of the Offering" which provides that if the Offering is cancelled, the Administrative Fee of $50,000 must be returned to investors.

100.    In compliance with the Escrow Agreement, Plaintiff Dou and other investors sent $550,000 to TD, as evidenced by the letter attached as Exhibit 2.

101.    The Escrow Agreement and the LP Agreement stipulates that the LP may request funds to be released by TD as escrow agent only if the Holdback Trigger has been satisfied.

102.    The Holdback Trigger was not satisfied.

103.    TD was holding onto $49.5 million of investor funds ($550,000 times 90

investors) as evidenced by the acknowledgement as Exhibit 2, given for each investor.

104.   TD breached the Escrow Agreement by wrongfully releasing the Plaintiffs' funds even though the condition specified for such release had not been satisfied.

105.   TD had a duty prior to release of the investors' funds to demand adequate documentation showing that a Project plan had been formally submitted to the Commissioner of Planning and Development for the City of Chicago.

106.   TD negligently released the funds from escrow without reviewing the requisite documents and without doing proper due diligence, falling short of its contractual obligations and a basic standard of care.

107.   TD's failure to observe a basic standard of care in its duty to investors caused damage to the investors both immediately and proximately, in the quantifiable amount of $49 million.

108.   The Plaintiffs were a direct participant in the TD-LP contract because the Subscription Agreement required them to submit investment funds subject to the TD-LP Agreement, making them a third party beneficiary of such contract, and certainly within the zone of persons to whom TD owed a duty of professional conduct, which they breached.

109.   As a result of TD's negligent breach, Plaintiffs' funds were unlawfully converted.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

**Count V**
**(against TD)**
**Tortious Conversion**

110.　Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

111.　TD received $49.5 million from the Plaintiffs for this Project and sent notices to Laytin and the LP that it had received this money, see Exhibit 2.

112.　TD knew, or should have known, and could reasonably have discovered, that the Plaintiffs invested in the escrow pursuant to the PPM, which obligated TD to hold them money and not release it until the Holdback Condition was satisfied.

113.　By taking Plaintiffs' money and giving it to a third party in violation of the terms under which the money was given, TD wrongfully converted the Plaintiff's funds.

114.　Without a contract directly with investors, TD had no title, right, or interest in the Plaintiff's money, and should have returned it immediately. Their failure to return the funds constitutes wrongful conversion.

115.　As a result of this wrongful conversion, the Plaintiffs have suffered damages.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count VI
### (against TD)
### Tortious Interference with Contract

116.   Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

117.   Plaintiffs have a valid contract with the LP based on the Limited Partnership Agreement and the Investment Documents.

118.   TD knew that Plaintiffs had a contractual relationship with the LP and with various parties associated with Defendant Laytin.

119.   TD knew that the escrow arrangement was for the benefit of the contract between the Plaintiffs and the LP, under which no funds were supposed to be released from escrow until the Holdback Trigger was satisfied.

120.   TD knew that release of the Plaintiff's funds the violated the contract between Plaintiffs and the LP.

121.   TD negligently, recklessly, and knowingly interfered with the contract between Plaintiffs and the LP.

122.   By virtue of TD's tortious interference in the contractual relationship, the Plaintiffs have suffered damages.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count VII
### (against all Defendants)

## Fraud

123.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

124.    The Defendants marketed the through Kaisheng Emigration Company (English name "Cansine" and their web site which is in Chinese is at www.cansine.com)

125.    The web site claims the Project (referred to in English as the Hilton) is "100% safe."  See Exhibit 4. (last visited November 22, 2018).

126.    The web site implies that the Project is active, alive, and ongoing.  It omits any statement about the failure to submit a Project plan to the City of Chicago Commissioner of Planning and Development.

127.    The web site says that each investor has full third party insurance to obtain a return of their money if they are not eligible for a green card due to events beyond their control.

128.    The web site is a public proclamation that benefits each of the Defendants.

129.    It contains the material misstatement that the Project is 100% safe, which is impossible for any investment, and which would disqualify the Project for EB-5 since the program requires that investors place capital "at risk."

130.    The web site fails to disclose material facts about the Project being slowed and dead.

131.    The Plaintiff and others relied on the web page since they speak Chinese and the web page is in Chinese.

132.    This reliance caused them to believe that the Project was still active. This caused damage for failure to take action to obtain recovery.

132.    The failure to inform investors of the truth was a ploy to drain their assets and to get more time to slap something together at the last minute as an excuse for not returning the money.

133.    The benefit of this fraud inured to all defendants: it gave them money and time, and violated the fiduciary duties owed to the investors.

134.    Defendants are jointly and severally liable for this fraud on the investors.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.


### Count VIII
### (against Laytin, the GP and LP)
### Breach of Fiduciary Duty

135.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

136.    The GP has a fiduciary duty to keep the limited partners fully informed of all material developments in the Project.

137.    This duty is separate and distinct from their contractual duty to limited partners.

138.   The GP and Laytin (as controlling person of the GP) knew as early 2015 that the Project plan had not been formally submitted to the Commissioner of Planning and Development, and they knew as early as April 2017 that the Project had been denied in whatever form it was informally – through a mere meeting – shown to the City.

139.   This created a duty to inform limited partners and to make clear their remedy to obtain a return of investment due to failure of condition precedent for the project.

140.   The duties violated include the duty of care, the duty of loyalty (no self-dealing) and the duty of good faith and fair dealing.

141.   Plaintiff Dou and investors have suffered for the failure of the GP, the LP, and Laytin to comply with their fiduciary duties.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.


### Count IX
(against all Defendants)
Appointment of Third-Party Administrator

142.   Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

143.   The practical question remains how the money in this case will be rightfully returned to the Chinese investors in full, accounting for interest, fees, costs, and other expenses.

144. The Chicago Convention Center Eb-5 lawsuit heard in this Court by Justice St. Eve is instructive.

145. That case involved a massive fraud whereby investors put their money into a project that did not actually exist – it was a fake, no shovel was ever put into the ground. The SEC brought suit under Rule 10b-5 and they won disgorgement of the investment back to the Chinese investors. The practical question for the Court became how to get the money back to the investors.

146. As a remedy, Justice St. Eve appointed a neutral third party to conduct an accounting, receive the disgorged funds and the fines, to make deductions for fees and costs, and to make sure that each investor got his or her proportional share. See "Order to Appoint a Distribution Agent," *SEC v. A Chicago Convention Center LLC*, 13-cv-00982 (January 31, 2018).

147. The same process can be used in this case.

148. At present, the Plaintiffs do not have any idea where their money is located. They are in need of an accounting from the LP, and a disgorgement or fine that can be placed with a neutral third party for accounting.

149. The remedy of constructive trust is recognized in this Court and in Illinois for situations where one party wrongfully holds the property of another.

WHEREFORE, the Plaintiffs demand a (i) full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees, and (ii) the Court appointment of an administrator / trustee / distribution agent to

collect all refunded money (by way of disgorgement or damages) and to perform a complete accounting of the escrow fund.

Dated:        March 19, 2018

                                        Respectfully Submitted,

                                        /s/ Glen J. Dunn, Jr.

Glen J. Dunn, Jr.                       Douglas Litowitz
Glen J. Dunn & Associates, Ltd.         Attorney at Law
221 N. LaSalle Street                   413 Locust Place
Suite 1414                              Deerfield, IL 60015
Chicago, Illinois 60601                 (312) 622-2848
(312) 880-1010                          Litowitz@gmail.com
gdunn@gjdlaw.com