UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINA DOU, on behalf of herself and all others similarly situated, | )<br>)<br>) |
| Plaintiffs, | ) No. 18 CV 7865<br>)<br>) |
| v. | ) Magistrate Judge Young B. Kim<br>) |
| CARILLON TOWER/CHICAGO LP, FOREFRONT EB-5 FUND (ICT) LLC, SYMMETRY PROPERTY DEVELOPMENT II LLC, and JEFFREY L. LAYTIN, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) December 12, 2022<br>) |

**MEMORANDUM OPINION and ORDER
and REPORT and RECOMMENDATION**

Although this investor-fraud case settled back in October 2020, significant issues still linger largely because of Defendants' empty promises of payment of the settlement amount. Before the court is Defendants' motion to terminate the court's appointment of a special master. In support of the motion Defendants assert that the special master has performed the tasks identified by the court and that any further work would be duplicative and unnecessary. Plaintiffs oppose the motion and argue that because Defendants have not provided the special master with the additional information requested to complete the investigation, Defendants should be sanctioned. For the following reasons, the motion is granted in part and denied in part:

**Background**

The parties reported to the court on October 29, 2020, that they resolved this class action case. (R. 295.) On February 4, 2021, the court granted final approval of the class settlement for the benefit of 83 class members. (R. 304 at 2.) The class settlement obligated Defendants to pay each class member $550,000 by March 21, 2021. (Id. at 1-2; R. 305 at 1.) Defendants did not do so and for about six months thereafter, they repeatedly reported to the court that they expected soon to have the funds from a loan from an overseas lender to satisfy their settlement obligations. Even now, however, Defendants have not met these obligations and do not appear to be able to do so.

On October 14, 2021, the court granted Plaintiffs' motion for the appointment of a special master in this case. (R. 351.) The following day, this matter was referred to this court for the selection of a special master under Federal Rule of Civil Procedure 53. (R. 352.) The parties conferred and agreed on the special master's identity, scope of work, and sources of compensation. (R. 378-1, Proposed Jt. Agreed Order.) Pursuant to the parties' agreement, on January 5, 2022, the court appointed Karim Mahmoud with Hadef & Partners LLC in Dubai, United Arab Emirates, to serve as the special master and entered an order outlining the scope of work to be performed. (R. 382; R. 383.) The special master then began investigating and responding to specific questions enumerated by the court, including whether Defendants had procured "a valid and enforceable $250 million loan" ("Loan") from an overseas lender and whether "Defendants and/or their counsel knowingly

2

misrepresent[ed] material facts to the court regarding the Loan or the terms of the closing escrow." (R. 383 at 4-6.)

The special master filed an initial report on February 16, 2022, concluding that "there never was any real loan" between Defendants and an overseas lender. (R. 387, Spec. Master's Initial Rep. at 1-2; see also R. 427, Spec. Master's Supp. Rep. at 1 ("[T]he alleged Loan was a fabrication, the purpose of which was seemingly to illicit funds from the Defendants in the form of alleged government and regulatory fees.").) On April 19, 2022, the court adopted the special master's conclusion, finding that "Defendants do not currently have, and never previously had, a valid and enforceable loan from any lender from which the class settlement payment obligations can be satisfied." (R. 400.) As to whether Defendants or their attorneys knowingly misrepresented material facts to the court regarding the Loan or the terms of the closing escrow, the special master concluded that he lacked sufficient information to answer this question. (R. 387, Spec. Master's Initial Rep. at 10.) He found that Defendants either lied to the court or "were potentially defrauded" into sending payments to offshore bank accounts to secure the funding of the Loan. (Id.) To issue a finding, the special master said he needed more information from Defendants and their attorneys. (Id. at 10-11.)

Thereafter, the special master reviewed additional information provided to him and on June 13, 2022, filed a supplemental report finding that Defendants and their attorneys misrepresented material facts regarding the Loan to the court. (R. 427, Spec. Master's Supp. Rep. at 2, 10-15.) Such misstatements included:

(1) Defendants had a valid and enforceable Loan with an overseas lender; (2) Defendants consulted with an accounting and legal expert in connection with the Loan; and (3) Defendants set up a title or closing escrow for funds from the Loan. (Id. at 10-14.) But because Defendants provided bank records verifying payments they made to purported lenders, the special master found that Defendants acted "in good faith in entering into the Loan and initially reporting on the same" to the court. (Id. at 2 (finding that Defendants "provided significant documentation that on their face evidenced legitimate efforts to secure a Loan to fund their settlement obligations").) As such, the special master concluded that he could not "authoritatively confirm" that Defendants knowingly misrepresented material facts to the court. (Id. at 20-21.)

To make a conclusive determination on this issue, the special master again requested additional documentation from Defendants, this time consisting of:

- evidence of a title or closing escrow being set up;
- evidence of legal or accounting experts being consulted in respect to the Loan;
- evidence of the [August 11, 2021] Guarantee Letter being called upon;
- evidence of the alleged [March 11, 2021] site visit being conducted;
- details of any attempt by the Defendants and/or their counsel to directly contact Al Hilal Bank; [and]
- any written communication or evidence of any of the Defendants or Defendants' counsel discussing the legitimacy, validity, or any irregularities in respect of the [L]oan, internally or with the Purported Lenders.

(Id. at 20.) Defendants did not provide the additional information the special master sought, opting instead to file the current motion.

4

## Analysis

Defendants seek to terminate the court's appointment of the special master. (R. 433, Defs.' Mot.) Based on conditions set forth in an agreement by the parties, (R. 378-1, Proposed Jt. Agreed Order), Defendants have paid the special master's fees—totaling more than $59,000 as of December 4, 2022, (R. 457; R. 461)—to investigate the questions enumerated by the court, (R. 382; R. 383). Defendants contend that the special master sufficiently answered these questions, having received verification that Defendants spent nearly $650,000 in purported origination and regulatory fees to try to secure the Loan, and that any additional investigation by the special master would be duplicative and unnecessary. (R. 433, Defs.' Mot. at 11-18.) Plaintiffs disagree, arguing that the special master's work is not yet complete, and that Defendants must provide him the additional information requested so that he can investigate whether Defendants or their attorneys knowingly misrepresented material facts to the court. (R. 438, Pls.' Resp. at 2-4.) Plaintiffs also ask for a negative inference, discovery sanctions, and default judgment based on Defendants' failure to provide "sufficient documentation showing they conducted due diligence before making incorrect statements of material fact" to the court. (Id. at 4-14.)

Federal Rule of Civil Procedure 53 governs the appointment of special masters and requires the court to "protect against unreasonable expense or delay" associated with such an appointment. Here, the special master has investigated the questions identified, compiled evidence, and rendered findings of fact in initial and

5

supplemental reports. (See R. 387, Spec. Master's Initial Rep. at 1-2; R. 427, Spec. Master's Supp. Rep.) In his initial report, the special master states:

> [i]n respect to determining whether or not the Defendants were aware of the non-existence of the Loan, I would suggest I be granted permission to seek confirmation from TD Bank on whether the payments of the fraudulent charges were indeed paid by Symmetry. If the answer to that question is in the affirmative, then it is likely that [Defendant] Symmetry [Property Development II, LLC]" ("Symmetry") [was] merely a victim of [a loan scam].

(R. 387, Spec. Master's Initial Rep. at 11.) The special master then received confirmation from TD Bank that Symmetry paid the fraudulent origination and regulatory fees. (R. 427, Spec. Master's Supp. Rep. at 2.) Accordingly, the special master concluded in his supplemental report that at least initially, Defendants exercised "good faith in entering into the Loan" and reporting that information to the court. (Id.) The special master expressed concerns, however, that at some point Defendants and their attorneys "likely" realized that the information they were providing the court was "at the very least unreliable and from questionable sources." (Id. at 20.) To investigate this issue, he set forth "subsequent steps" to be taken, including the gathering of additional documents from Defendants and questioning of witnesses, including Defendants, their counsel, the purported lenders, and the third-party advisors to the Loan. (Id. at 20-21.)

The court grants Defendants' motion to terminate the appointment of special master. The special master has largely completed his work and any additional investigation by him would result in "unreasonable expense" in violation of

6

Rule 53(a)(3). Defendants have expended a significant sum[1] to fund the special master's investigation, and only part of one question remains. That question pertains to whether Defendants or their attorneys knowingly misrepresented material facts to the court regarding the Loan or the terms of the closing escrow and this question is better left for the court, rather than an attorney who is located in Dubai. Selecting an attorney in the Middle East made sense given the source of the alleged Loan, but now that the parties have established that the Loan never existed, assistance from someone in the Middle East is no longer necessary.

As discussed, the special master has concluded that Defendants and their attorneys did not knowingly misrepresent material facts to the court—at least initially. (R. 427, Spec. Master's Supp. Rep. at 2.) Whether Defendants or their attorneys later learned that the Loan was fraudulent and conveyed information to the court they knew to be incorrect remains unclear. (Id. at 2, 20.) But the court agrees that Defendants should be "spared" the cost of continuing to pay the special master's fees to resolve that narrow issue. (See R. 441, Defs.' Reply at 2.) Moreover, the court does not wish for the special master to have to track down Defendants for full and timely payment for his services. Defendants still have an outstanding balance of $10,384.77 to be paid to the special master even after the court granted Defendants extra time to pay, and the court has ordered Defendants to make full

---

[1] Pursuant to an agreement and the court's order of January 5, 2022, Defendants are responsible for paying 100% of the special master's fees. (See R. 383 at 3 ("If [the special master] concludes that the subject loan does not exist, is fraudulent, or is not reasonably believable by a diligent commercial borrower, then Defendants must pay 100% of his fees.").)

7

payment. (R. 453; R. 461.) Accordingly, the court terminates the special master's appointment.

In his stead, this court recommends[2] that the court perform certain investigatory steps the special master proposed to determine whether additional light can be shed on the sole remaining issue. Lying to the court "is among the worst kinds of misconduct"—and not only "corrupt[s] the litigation process" but also "waste[s] judicial resources and the time and money of honest parties." *Martin v. Redden*, 34 F.4th 564, 568 (7th Cir. 2022) (internal quotations and citation omitted). To root out such misconduct, courts "are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Sanders v. Melvin*, 25 F.4th 475, 481 (7th Cir. 2022) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227 (1821)). Here, in determining whether Defendants or their attorneys committed a sanctionable lie, the court should examine whether they "acted intentionally, or 'with a degree of culpability that exceeds simple inadvertence or mistake.'" *Id.* at 485 ("The conduct must be 'an indication of bad faith or a willful abuse of the judicial process.'" (quoting *Ebmeyer v. Brock*, 11 F.4th 537, 547 (7th Cir. 2021)).

To this end, the court should order an *in camera* inspection of the documents the special master identified—more specifically, documents referring or relating to:

---

[2] This court's current jurisdiction is limited to appointing and supervising the work of a special master. (See R. 352.) It does not extend to investigating Defendants' previous representations on their alleged Loan to the court.

8

    A.    The set-up of a title or closing escrow;
    B.    Consultation with legal or accounting experts in respect to the Loan;
    C.    The August 11, 2021 Guarantee Letter being called upon;
    D.    The alleged March 11, 2021 site visit being conducted;
    E.    Any attempt by Defendants and/or their counsel to directly contact Al Hilal Bank; and
    F.    Any written communication or evidence of any of Defendants or their attorneys discussing the legitimacy, validity, or any irregularities in respect of the Loan, internally or with the Purported Lenders.

The court should also question under oath Jason Ding, the Symmetry manager who "act[ed] on behalf of Symmetry in connection with securing the Loan," (R. 387, Spec. Master's Initial Rep. at 4). In their motion, Defendants characterize Ding as "principally responsible for [D]efendants' efforts to obtain a loan to fund the class action settlement and recapitalize the Chicago project." (R. 433, Defs.' Mot. at 3.) Based on information provided by Defendants, the special master indicated that Ding worked with a third-party broker and advisors to identify prospective lenders. (R. 427, Spec. Master's Supp. Rep. at 6.) Those third parties in turn connected Ding with Richard Simon, a purported domestic agent for an overseas lender. (Id.) In his efforts to ensure the funding of the Loan, Ding allegedly attended a March 11, 2021 site visit and was involved in communications with Simon and the purported lender. (Id. at 6-7.) Given Ding's knowledge of the facts relating to the Loan, the court should question him to resolve the outstanding question of whether Defendants knowingly misrepresented material facts to the court.

As for Plaintiffs' request for a negative inference, discovery sanctions, and default judgment, (R. 438, Pls.' Resp.), the court declines to grant such request

9

because Plaintiffs have not shown they are entitled to such relief, and the court has already entered a consent judgment in this action to enforce Defendants' payment obligation under the Settlement Agreement, (R. 456).

## Conclusion

For the foregoing reasons, the court grants Defendants' motion in part and denies it in part. In accordance with this order Special Master Mahmoud's appointment is hereby terminated. However, this court recommends that the court order Defendants to submit the documents identified herein for an *in camera* inspection and to produce Jason Ding for in-court questioning under oath when ordered.

ENTER:

_____
Young B. Kim
United States Magistrate Judge